**Case Nos. 13-55156, 13-55157, 13-55226 and 13-55228**

IN THE

# UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

| | |
|---|---|
| FOX TELEVISION STATIONS, INC., ET AL., | NBCUNIVERSAL MEDIA LLC, ET AL., |
| *Plaintiffs-Appellees,* | *Plaintiffs-Appellees,* |
| v. | v. |
| AEREOKILLER LLC, ET AL., | AEREOKILLER LLC, ET AL., |
| *Defendants-Appellants.* | *Defendants-Appellants.* |

---

*On Appeal From The United States District Court*
*For The Central District Of California*
*Hon. George H. Wu, District Judge*
*Nos. CV 12-6921-GW (JCx); CV 12-06950-GW (JCx)*

---

## APPELLANTS' CONSOLIDATED OPENING BRIEF

---

BAKER MARQUART LLP
Ryan G. Baker (Bar No. 214036)
Jaime W. Marquart (Bar No. 200344)
10990 Wilshire Boulevard, 4th Floor
Los Angeles, California 90024
(424) 652-7800

*Attorneys for Defendants-Appellants*
*Aereokiller LLC; Alkiviades David;*
*FilmOn.TV Networks, Inc.; FilmOn.TV,*
*Inc.; and FilmOn.com, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Appellant-Defendant Aereokiller LLC certifies, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, it has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Appellant-Defendant FilmOn.TV Networks, Inc. certifies, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, it has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Appellant-Defendant FilmOn.TV, Inc. certifies, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, it has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Appellant-Defendant FilmOn.com, Inc. certifies, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, it has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Appellant-Defendant Alkiviades David certifies, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, he is an individual and has no corporate status to disclose.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................1

JURISDICTIONAL STATEMENT ..............................................................3

ISSUES PRESENTED ..................................................................................4

STATEMENT OF THE CASE ......................................................................4

STATEMENT OF FACTS ............................................................................6

    Aereokiller ..............................................................................................6

    Aereokiller's Technology Does Not Infringe The Networks' Copyrighted
    Over-The-Air Broadcast Programming ..................................................8

    Technology The Same As Aereokiller's In All Material Respects Was Found
    To Be Non-Infringing By The Southern District Of New York ..........8

SUMMARY OF ARGUMENT ......................................................................9

ARGUMENT ...............................................................................................11

  I.  Standard Of Review ...........................................................................11

  II.  The Networks Cannot Establish A Likelihood Of Success On The Merits...12

    A.  Private Transmissions Do Not Violate The Transmit Clause ....................12

      1.  Congress intended to exempt private performances from liability..........11

      2.  There is nothing communal about Aereokiller's transmissions, rendering
        *Fortnightly* and *Teleprompter* inapposite......................................................14

      3.  Case law in this circuit and in other circuits protects private
        transmissions ...............................................................................17

      4.  Consumers use Aereokiller's technology to make only private
        transmissions, which do not violate the Transmit Clause ..............20

5.   Aereokiller's technology enables consumers to engage in activities permitted under the "fair use" doctrine ........................................................21

B.   Precedent In This Circuit Is Consistent With *Cablevision* .........................25

III.   The Networks Failed To Demonstrate Irreparable Harm ...........................29

A.   There is No Harm Because There Was No Infringement ..........................30

B.   The Networks' Harms Are Speculative .......................................................31

IV.  The Balance of Hardships Favors Aereokiller ...............................................33

V.   The District Court's Rulings Harm The Public Interest...............................35

CONCLUSION ....................................................................................................38

STATEMENT OF RELATED CASES ................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*American Broadcasting Companies, Inc. v. Aereo, Inc.*,
    874 F. Supp. 2d 373 (S.D.N.Y. 2012) ........................................................passim

*Brown v. California Dep't of Transp.*,
    321 F.3d 1217 (9th Cir. 2003) ...........................................................................11

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008) .......................................................................passim

*Colorado River Indian Tribes v. Town of Parker*,
    776 F.2d 846 (9th Cir. 1985) .............................................................................31

*Columbia Broadcasting System, Inc. v. Democratic National Committee*,
    412 U.S. 94 (1973).............................................................................................22

*Columbia Pictures Industries v. Professional Real Estate Investors*,
    866 F.2d 278 (1989 9th Cir.) ............................................................................27

*CoStar Group v. LoopNet, Inc.*,
    373 F.3d 544 (4th Cir. 2004) .............................................................................24

*Disabled Rights Action Committee v. Las Vegas Events, Inc.*,
    375 F.3d 861 (9th Cir. 2004) .............................................................................37

*Does 1-5 v. Chandler*,
    83 F.3d 1150 (9th Cir. 1996) .............................................................................11

*Ellingson v. Burlington Northern, Inc.*,
    653 F.2d 1327 (9th Cir. 1981) ...........................................................................37

*Fed. Trade Comm'n v. Enforma Natural Products, Inc.*,
    362 F.3d 1204 (9th Cir. 2004) ...........................................................................11

*Fortnightly Corp. v. United Artist Television, Inc.*,
    392 U.S. 390 (1968)......................................................................................14, 15

i

*Fox Broadcasting Company, Inc., et al. v. Dish Network, L.C.C.*,
  2012 WL 5938563 (C.D. Cal., November 7, 2012) ..............................23, 24, 25

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
  4 F.3d 819 (9th Cir. 1993) ................................................................................33

*Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*,
  545 U.S. 913 (2005)..........................................................................................36

*MGIC Indemnity Corp. v. Weisman*,
  803 F.2d 500 (9th Cir. 1986) ...........................................................................37

*On Command Video Corp. v. Columbia Pictures Industries*,
  777 F. Supp. 787 (N.D. Cal. 1991)............................................................passim

*Random House, Inc. v. Rosetta Books LLC*,
  283 F.3d 490 (2d Cir. 2002) .............................................................................34

*Softman Prods. Co., LLC v. Adobe Systems, Inc.*,
  171 F. Supp. 2d 1075 (C.D. Cal. 2001) ......................................................31, 36

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)...................................................................................passim

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
  415 U.S. 394 (1974)...........................................................................14, 15, 16

*Warner Bros Ent. Inc. v. WTV Systems, Inc.*,
  824 F. Supp. 2d 1003 (C.D. Cal. 2011) ......................................................passim

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)........................................................................................9, 31

**FEDERAL STATUTES**

17 U.S.C. § 106(4) ...........................................................................................12, 27

28 U.S.C. § 1292(a)(1).............................................................................................3

28 U.S.C. §§ 1331, 1338(a) .....................................................................................3

**RULES**

Fed. R. App. P. 4(a)(1)..............................................................................................4

Federal Rule of Evidence 201 ...................................................................37

**REGULATIONS**

Rep. No.487, 92d ........................................................................................16

**OTHER AUTHORITIES**

89th Cong., 1st Sess. (Comm. Print 1965)................................................14

H.R. Rep. 94-1476 (1976), reprinted in 1976 U.S.C.C.A.N. 5659 .........13

H.R. Rep. No. 94-1476 (1976), reprinted in 1976 U.S.C.C.A.N. 5659...................13

## **PRELIMINARY STATEMENT**

In its 1976 revisions to the Copyright Act, Congress preserved the individual's private performance right, confirming that private transmissions of a work's performance need not be licensed.  Such private transmissions have never been actionable under the Copyright Act.  In contrast, Congress determined that community antennas, which retransmit a single public network broadcast to multiple thousands of viewers, engaged in public transmissions.

In this case, the Networks[1] argue that Aereokiller[2] is a new form of community antenna.  But there is nothing communal about Aereokiller's mini-antennas.  They are not shared; rather, each mini-antenna is assigned to a unique individual user to be controlled exclusively by that user.  Indeed, the primary difference between an Aereokiller mini-antenna and a set of rabbit ears or a rooftop

---

[1] The "Networks" are appellees here and plaintiffs in the two district court cases underlying this consolidated appeal.  Those plaintiffs are: Fox Television Stations, Inc.; Twentieth Century Fox Film Corporation; Fox Broadcasting Company, Inc.; NBCUniversal Media, LLC; Universal Network Television, LLC; Open 4 Business Productions, LLC; NBC Subsidiary (KNBC-TV) LLC; Telemundo Network Group LLC; American Broadcasting Companies, Inc.; WIN-TV Broadcasting, LLC; American Broadcasting Companies, Inc.; ABC Holding Company, Inc.; Disney Enterprises, Inc.; CBS Broadcasting Inc.; CBS Studios Inc.; and Big Ticket Television, Inc.

[2] For purposes of this brief, "Aereokiller" is defendants Aereokiller LLC; Filmon.TV Inc.; FilmOn.TV Networks, Inc.; Filmon.com, Inc.; and Alkiviades David.  All defendants appeal the district court's preliminary injunction, because all defendants were subject to the preliminary injunctions.  Aereokiller LLC is a separate LLC that licenses technology to FilmOnNetworks.TV.  FilmOnNetworks.TV is the entity that provides the service to consumers at issue in this case.

antenna is the location of the hardware receiving free over-the-air broadcast signals.

Aereokiller makes no public performance. Because each mini-antenna is unique, each transmission consumers make using Aereokiller technology is private. The district court found these transmissions public because they must be aggregated with either the original public network public broadcast or with other, discrete transmissions of the same program by different users. But that conclusion does not withstand scrutiny. Each of Aereokiller's users transmits to him or herself alone, from a unique copy, stored on a remotely hosted digital recording device ("DVR"). The district court's interpretation effectively eliminates an individual's right to privately perform broadcast content, whether that performance is playing recorded programming via video cassette tape, DVR, Slingbox, [3] or through any one of the now hundreds of capable devices.

The Southern District of New York recently found similar technology legal. *See American Broadcasting Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012) ("*Aereo*") (appeal pending). Although the district court in this case found no meaningful distinction between the technology involved in *Aereo* and Aereokiller's mini-antenna technology, the court reached a different result.

---

[3] Slingbox is a consumer device enabling users to transmit recorded broadcast content over the Internet to computers or mobile devices.

Based on its finding that the transmission consumers make using Aereokiller's technology constitutes a public performance under the transmit clause of the Copyright Act (the "Transmit Clause"), the district court enjoined Aereokiller from operating its service in the Ninth Circuit. That court erred in making those rulings. Each of Aereokiller's consumers receives, records, and transmits a unique copy of the Networks' programming – accordingly, any transmission (or performance) through Aereokiller's technology is decidedly private. This Court should reverse the district court's ruling.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to hear the Networks' preliminary injunction motions pursuant to 28 U.S.C. §§ 1331, 1338(a). This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

The district court's orders granting the preliminary injunctions were entered on December 27, 2012. (ER 25-27 (*Fox*); 28-30 (*NBC*).)[4] Those orders became effective on January 4, 2013, in the *NBC* case, and on January 6, 2013, in the *Fox*

---

[4] The abbreviations used in this brief are: (a) "CR" for the docket number(s); (b) "ER" for Aereokiller's unsealed and sealed excerpts of record followed by the applicable page number(s); and (c) "TR" for transcript followed by the applicable date and page number(s). Volumes 11 and 12 of the ER were filed under seal. For CR and ER cites, when applicable, the *Fox* case precedes the *NBC* case. In the case of the transcripts cited, because all the hearings at issue were held jointly (*i.e.*, with all parties in both the *Fox* and *NBC* cases present) only the *Fox* transcript are included since they are identical to the *NBC* transcripts.

case.  (CR 93 (*Fox*); 83 (*NBC*).)[5]  Aereokiller timely appealed on January 25, 2013.

(ER 300-03 (*Fox*); 287-90 (*NBC*)); *see Fed. R. App. P.* 4(a)(1).

## ISSUES PRESENTED

1.    In issuing preliminary injunctions, did the district court err by not

finding that Aereokiller's technology, which allows an individual to remotely and

exclusively direct equipment assigned to the individual to receive, record, and

transmit a unique copy of over-the-air network broadcast programming for the

individual's private use, enables private, not public, performances?

2.    Did the district court err by ignoring the relevance of the uniqueness

of the copy from which an individual transmission originates to the analysis of

whether a performance of that copy is private or public under the Copyright Act?

## STATEMENT OF THE CASE

Aereokiller appeals two preliminary injunctions the district court issued in

*Fox Television Stations, Inc., et al. v. Aereokiller LLC, et al.*, (CV 12-6921-GW

(JCx))("*Fox*") and *NBCUniversal Media LLC, et al. v. Aereokiller LLC, et al.*, (CV

12-6950-GW (JCx)) ("*NBC*").  The *Fox* and *NBC* cases are before the Honorable

George H. Wu and are designated related.  The injunctions bar Aereokiller from

providing a service to its users in the Ninth Circuit that gives each individual user

exclusive control of a remotely located mini-antenna and digital recording device,

---

[5] Those orders became effective two days after the bond posting requirements were
met.  (ER 27 (Fox); 30 (*NBC*).)

4

with which each user can record the Networks' over-the-air broadcast transmission to view on a computer or mobile device.  (ER 25-27 (*Fox*); 28-30 (*NBC*).)

On August 10 and August 13, 2012, the *Fox* and *NBC* plaintiffs, respectively, filed actions against Aereokiller for copyright infringement.  (CR 1 (*Fox*); 1 (*NBC*).)  The Networks allege that Aereokiller – in violation of federal copyright and trademark laws – launched a commercial Internet streaming service that allows users to access the Networks' copyrighted over-the-air broadcast programming without the Networks' authorization.  (ER 625-49 (*Fox*); 476-548 (*NBC*).)  Aereokiller denies violating federal copyright and trademark laws.  (*See*, *e.g.*, ER 415-23 (*Fox*); 304-11 (*NBC*).)

After filing the complaints, the Networks applied for preliminary injunctions in November 2012.[6]  (ER 1310-41 (*Fox*); 1618-52 (*NBC*).)[7]  In their papers, the Networks contended that because Aereokiller was an unlicensed "retransmitter," despite the fact that the consumers have the right to use technology to receive, copy and privately perform the Networks' copyrighted over-the-air broadcast

---

[6] In the lead up to filing the applications, the Networks filed motions to conduct expedited discovery in August 2012 in connection with their contemplated preliminary injunction motions.  (ER 2268-88 (*Fox*); 2033-48 (*NBC*).)  Aereokiller opposed those motions as overly broad and premature.  (ER 2020-32 (Fox); 1998-2011 (*NBC*).)  On September 13, 2012, the district court granted in part the Networks' requests for expedited discovery.  (ER 1947-50 (*Fox*); 1951-54 (*NBC*).)  Limited expedited discovery took place in October 2012.  (*See* ER 1935-37 (*Fox*); 1942-44 (*NBC*).)

[7] The Networks' filings in connection with the preliminary injunctions were identical.

programming, Aereokiller should be enjoined.  (*See, e.g.*, ER 1317 (*Fox*); 1628 (*NBC*).)  They did not argue that Aereokiller was engaged in unauthorized copying; nor did they argue any consumer infringement of their rights.[8] Aereokiller opposed the Networks' applications for preliminary injunctions, because it complies with well-established law that allows Aereokiller to provide consumers with technology to access unique copies of broadcast television made by those particular individuals.  (ER 926-55 (*Fox*); 1118-47 (*NBC*).)[9]

The district court held three joint hearings on the motions, which took place on December 6, 20, and 27, 2012.  (ER 32-173 (Transcripts).)  On December 27, 2012, the district court issued preliminary injunctions, limiting their scope to the Ninth Circuit.  (ER 1-12 (ruling), 25-27 (order) (*Fox*); 13-24 (ruling), 28-30 (order) (*NBC*).)  The *Fox* and *NBC* cases have been stayed pending the outcome of this appeal and the Networks' cross-appeal.  (CR 111 (*Fox*); 110 (*NBC*).)

## STATEMENT OF FACTS

### Aereokiller

Aereokiller's technology does not broadcast unlicensed content to the public.  In fact, the only relevant public "transmission" in the Aereokiller user experience is the original, over-the-air broadcast from the Networks to each user's

---

[8] For that reason, this appeal concerns only the Transmit Clause, not any violation of the reproduction right.

[9] Like the Networks' filings, Aereokiller's filings in connection with the preliminary injunctions were virtually identical.

individual mini-TV antenna.  Aereokiller remotely locates those mini-antennas for its users, in addition to the user's tuner and digital video recording device, all of which are assigned to, and exclusively controlled by, a single user.  The only functional differences between Aereokiller's technology and the technology involved in the typical home viewing experience are: (1) The user's private mini-antenna and digital recording device are remotely located; (2) Aereokiller's Internet software allows users to tune a specifically assigned mini-antenna, to select content of their choosing, much like one routinely does using a traditional remote control in front of a television; and (3) Aereokiller enables a user to view content selected and recorded by that user on any Internet-enabled device.

No two "transmissions" over Aereokiller's platform are ever shared among users, and Aereokiller never selects what the user chooses to watch and/or record. Rather, Aereokiller's technology depends on its users' choices.  A user must select programming and then determine when that programming will be privately viewed by that same user.

The district court's ruling on the preliminary injunctions assumed Aereokiller's description of its own technology was accurate, and similar to Aereo's technology in all material respects, despite the Networks' objections. (ER 4 (*Fox*); (16 (*NBC*).)

## Aereokiller's Technology Does Not Infringe The Networks' Copyrighted Over-The-Air Broadcast Programming

Aereokiller's technology is based on mini-antennas that – along with routers, servers, adapters, tuners, transcoders and other equipment  – allow users to receive "free-to-air" broadcast television programming.  Each user is assigned a dedicated mini-antenna to be is exclusively controlled by that user.  (ER 1065 (*Fox*); 1257 (*NBC*).)  In response to user requests, Aereokiller technology encodes the programming the user selects into formats suitable for distribution and then allows the user to transmit from the user's copy over the Internet to be viewed on any Internet-enabled device the user controls.  (ER 1005, 1071 (*Fox*); 1257, 1263 (*NBC*).)  The user controls the viewing experience at all times and has the ability to stop, pause, close the application or switch channels.  (ER 1067, 1071 (*Fox*); 1259, 1263 (*NBC*).)  The system is designed so that each user has a unique directory not shared with any other user.  (ER 1066 (*Fox*); 1258 (*NBC*).)

Aereokiller's technology required a substantial investment of time and resources to design and test – in all, over ten million dollars of investment.  (ER 1072, 1074-76 (*Fox*); 1264, 1266-68 (*NBC*).)

## Technology The Same As Aereokiller's In All Material Respects Was Found To Be Non-Infringing By The Southern District Of New York

The first case to test technology similar to Aereokiller's remote, mini-antenna and DVR technology, *Aereo*, found it did not infringe any copyright.

8

Here, the district court based its ruling on the assumption that Aereokiller's technology is the same in all material respects to the technology at issue in *Aereo*. (ER 4 (*Fox*); 16 (*NBC*).)  Despite that assumption, the district court reached a different result, finding that Aereokiller violated the Transmit Clause by allowing users to remotely tune into, record and then playback over-the-air broadcast programming that each user is freely licensed to view.  (*See* ER 5-7 (*Fox*); 17-19 (*NBC*).)

## SUMMARY OF ARGUMENT

To obtain a preliminary injunction, a plaintiff must show a likelihood of success on the merits, likely irreparable harm, that the balance of equities tips in its favor, and that such an injunction serves the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Networks did not satisfy any of these necessary elements.

The Networks did not show they are likely to succeed on the merits. Through Aereokiller's technology, a user may remotely record and privately view television programming the user indisputably has the right to record and view.  The technology features two essential components.  First, it features thousands of mini-antennas, each of which is assigned to a unique user.  No mini-antenna is simultaneously shared by users.  Second, Aereokiller provides each user with a dedicated hard drive, on which the user's selected programming is recorded by the

9

user for subsequent viewing. Aereokiller remotely hosts the same type of technology that already exists in millions of homes across the United States. That technology, the television, antenna and DVR, has always been declared legal by Congress and the courts. Because the consumer can use Aereokiller's mini-antenna technology to make private performances not prohibited by the Transmit Clause of the Copyright Act, the Networks did not – and cannot – establish a likelihood of success on the merits.

The Networks also did not demonstrate likely irreparable harm, because Aereokiller has not infringed any of the Networks' copyrights (and thus the Networks have not suffered an injury). The only evidence of irreparable harm offered by the Networks consists of impermissibly speculative, hypothetical monetary harm.

Additionally, the Networks failed to establish that the balance of harms favors them, because the district court based its decision on its erroneous ruling on likelihood of success and the injunctions present a threat to Aereokiller's existence.

Lastly, the district court erred in holding that the injunctions serve the public interest. The public has an absolute and unfettered right to receive, copy and watch broadcast programming at any time. In fact, the entire premise of the statutory scheme related to free over-the-air television aims to ensure that

individuals have access to that programming. Moreover, technological innovation serves the public interest.

Aereokiller should not be enjoined from offering consumers the full-range of its technology in the Ninth Circuit. The district court's injunctions should be reversed. Aereokiller should once again be able to enable its users to privately transmit over-the-air broadcast content in the Ninth Circuit.

## ARGUMENT

### I.    Standard Of Review

This Court reviews *de novo* a district court's conclusion of law in granting a motion for preliminary injunction. *Brown v. California Dep't of Transp*., 321 F.3d 1217, 1221 (9th Cir. 2003). Otherwise, a district court's grant of a preliminary injunction is reviewed for abuse of discretion. *Fed. Trade Comm'n v. Enforma Natural Products, Inc.*, 362 F.3d 1204, 1211 (9th Cir. 2004). A preliminary injunction will be reversed when a district court based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Id.* at 1212. Where a district court is alleged to have relied on erroneous legal premises, review is plenary. *Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996).

## II. __The Networks Cannot Establish A Likelihood Of Success On The Merits__

The Copyright Act's Transmit Clause and case law in the Ninth Circuit and in other circuits provides that private transmissions, such as those consumers make using Aereokiller technology, do not violate the Copyright Act.

### A.    __Private Transmissions Do Not Violate The Transmit Clause__

#### 1.    Congress intended to exempt private performances from liability

The Transmit Clause gives content owners the exclusive right to "perform the copyrighted works *publicly*."  17 U.S.C. § 106(4) (emphasis added).  The definitional section states:

> To perform or display a work 'publicly' means . . . to transmit or otherwise communicate a performance or display of the work . . . *to the public*, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or different times.

*Id.* § 101 (emphasis added).  The phrase "to the public" reflects Congress' intent that private performances do not violate copyright holders' rights.  Only public performance transmissions generate liability for infringement.  Of course, an individual is not liable for watching a previously recorded network broadcast program in his or her own home, office or elsewhere (for instance, via Slingbox).  Conversely, one would be liable for a public showing of that same recorded broadcast.

12

In crafting the Transmit Clause and distinguishing between public and private transmissions, Congress balanced potentially competing policy aims.  The Transmit Clause both encourages the widespread public access to broadcast programming (by allowing private transmissions) and protects the expression of content owners (by prohibiting public transmissions).  *See* H.R. Rep. 94-1476, at 65 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5678.  The Transmit Clause expresses in precise language the Congressional intent that private performances do not infringe copyright.  Congress summarized its intent in a way that leaves no doubt that only *public* performances are actionable under the Transmit Clause:

> [a]lthough any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a 'performance' or 'display' under the bill, it would not be actionable as an infringement unless it were done 'publicly,' as defined in section 101.  Certain other performances and displays*, in addition to those that are 'private'* are exempted or given qualified copyright control under sections 107 and 118.

H.R. Rep. No. 94-1476, at 63 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5678 (emphasis added).  Thus, copyright holders cannot prohibit private transmissions.  The legislative record shows that Congress understood that its definition of transmission would limit the ability of copyright holders to prevent private transmissions:

> The definition of 'publicly' … would, in general, exempt private performances and exhibitions from the copyright owner's control, and the limitations in the remaining

13

> sections of the chapter … would further narrow the scope
> of his rights.

Register of Copyrights, Copyright Law Revision, Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., at 22 (Comm. Print 1965).

Were private transmissions not excluded from liability, the rights individuals have enjoyed since the advent of the television would be curtailed, if not eliminated.  The Networks cannot dispute that pursuant to the Transmit Clause an individual may, for example, install a private antenna on a roof and use it to transmit a television signal to a television inside the house.  Further, that individual may unquestionably then also transmit that same signal to other televisions in the home, whether by running separate wires from rooftop antenna directly to other televisions or by running separate wires from one television to another, or by using wireless technology.  Were there no right to privately transmit copyright material, anyone with an antenna would be forced to obtain licenses to watch television throughout their home.  That is simply not the law.

> 2.     There is nothing communal about Aereokiller's transmissions, rendering *Fortnightly* and *Teleprompter* inapposite

The district court concluded that because Congress addressed *Fortnightly Corp. v. United Artist Television, Inc.*, 392 U.S. 390, 391 (1968) ("*Fortnightly*"), and *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974)

14

("*Teleprompter*"), with the Copyright Act, Congress also intended the Transmit Clause to preclude the type of private transmissions Aereokiller users make.[10] (*See, generally*, ER 6-7 (*Fox*); 18-19 (*NBC*).)  That finding was in error.  In *Fortnightly* and *Teleprompter*, multiple subscribers paid a company to receive the same television signal from a company-owned, community antenna on a hill. *Fortnightly*, 392 U.S. at 391; *Teleprompter* 415 U.S. at 399-400.  The *Fortnightly* and *Teleprompter* defendants had access to the same transmission from the same antenna.  But while Congress adopted the Section 111 compulsory license and royalty scheme in the Copyright Act, in response to *Fortnightly* and *Teleprompter*, it simultaneously explicitly maintained the historic exemption of private performances from copyright protection.  Congress, of course, has not acted to modify the statutory scheme in the five years since the *Cablevision* decision, which the district court wrongly concluded misinterpreted congressional intent with respect to the Transmit Clause.

The district court also cited Congress' response to *Fortnightly* to conclude the Second Circuit in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 134-35, 139 (2d Cir. 2008) ("*Cablevision*"), incorrectly found an equivalency

---

[10] Although the district court did not cite *Teleprompter* in its opinion, that decision is a companion case to *Fortnightly*.  In *Teleprompter*, the broadcast networks asked the Supreme Court to reconsider their *Fortnightly* decision in light of basic changes in the way retransmission services operated in the six years after *Fortnightly*.  *Teleprompter*, 415 U.S. at 404.  The Supreme Court found that these new operational facts had no significance for copyright infringement analysis and declined to re-consider the *Fortnightly* holding.  *Id.* at 404-06.

between what an individual can lawfully do and what a commercial provider doing the same for a number of individuals may lawfully do. (ER 6-7 (*Fox*); 19-20 (*NBC*).) But Congress' response to *Fortnightly* and *Teleprompter* was to revise statutory law, enacting a specific compulsory license and royalty scheme for public retransmission by cable companies. The Copyright Act in no way repudiated or circumscribed traditional fair use rights. The legislative history shows that Congress was extremely interested in preserving those fair use rights:

> Specifically, it is not the intention of the Committee to restrain the home recording, from broadcasts or from tapes or records, of recorded performances, where the home recording is for private use and with no purpose of reproducing it or otherwise capitalizing commercially on it.

H. Rep. No. 487, 92d Cong., 1st Sess. 7, reprinted in (1971) U.S. Code Cong. & Admin. News, pp. 1566, 1572. The use of the word "private" above is significant and parallels conceptually the congressional intent to exempt private performances from liability under the Transmit Clause. Congress was adamant that viewer be able to privately record and transmit the Networks' programming.

In its seminal *Sony* decision, the Supreme Court recognized that individual television viewer rights to record programming within the context of their personal use were paramount to Congress in drafting the Copyright Act:

> One may search the Copyright Act in vain for any sign that the elected representatives of the millions of people who watch television every day have made it unlawful to copy a program for later viewing at home, *or have enacted a flat*

16

> *prohibition against the sale of machines that make such copying possible*.  It may well be that Congress will take a fresh look at this new technology, just as it so often has examined other innovations in the past.  But it is not our job to apply laws that have not yet been written.

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984) ("*Sony*") (emphasis added).  In light of the intent expressed by both Congress and the Supreme Court to allow home viewers to use technology to record and view copyrighted programming in their own homes, the district court's suggestion that the Copyright Act somehow intended to abrogate or be indifferent to the individual fair use rights is unfounded.

          3.     <u>Case law in this circuit and in other circuits protects private transmissions</u>

Legal decisions in the Second and Ninth Circuits made well after the Copyright Act confirm Aereokiller's technology is not infringing.  Whether a performance is public or private, in the context of the Transmit Clause, centers on whether there is a public or private transmission.  *See Cablevision*; *see also Aereo*.  In other words, unless a transmitter such as Aereokiller transmits the performance to the public from a single copy or source, there is no violation of the Transmit Clause.

*Cablevision* establishes this fundamental principle.  In *Cablevision*, a "Remote Storage DVR" ("RS-DVR") system allowed customers who did not have a stand-alone DVR in their homes to record and store cable programming on

central hard drives housed and maintained by Cablevision at a remote location. *Cablevision*, 536 F.3d at 125. The Second Circuit explicitly rejected the district court's conclusion that the RS-DVR technology violated the Transmit Clause's right of public performance, finding that system "only makes transmissions to one subscriber using a copy made by that subscriber" and therefore "the universe of people capable of receiving an RS-DVR transmission is the single subscriber whose self made copy is used to create that transmission." *Id.* at 137.

Analyzing Cablevision's system under the Transmit Clause, that court reasoned that "the *transmit clause* directs us to identify the potential audience of a given transmission, *i.e.*, the persons 'capable of receiving' it, to determine whether that transmission is made 'to the public.'" *Id*. at 139 (emphasis added). In considering the retransmission system's technological architecture, the court stated that "because the RS-DVR system, as designed, only makes transmissions to one subscriber using a copy made by that subscriber, we believe that the universe of people capable of receiving an RS-DVR transmission is the single subscriber whose self-made copy is used to create that transmission." *Id.* at 137. Because each RS-DVR transmission was "made to a single subscriber using a single unique copy," the transmission was private, not public. *Id.* at 139.

More recently, in *Aereo*, the Southern District of New York applied *Cablevision* to find that a service, like Aereokiller's, which assigns each consumer

18

a unique mini-antenna with DVR capabilities to view television programming,
does not violate the Transmit Clause. *Aereo*, 874 F. Supp. 2d at 385-387. As a
result, *Aereo* was not enjoined from operating. *Id.* at 405.

The district court explicitly – and wrongly – rejects *Cablevision* and *Aereo*'s
reasoning regarding the Transmit Clause and what constitutes a public
performance. (*See* ER 5-7 (*Fox*); 17-19 (*NBC*).) The court states that "the concern
is with the performance of the copyright work, irrespective of which copy of the
work the transmission is made from." (ER 6 (*Fox*); 18 (*NBC*).) The court errs in
ignoring the nature of the copy from which a transmission originates.[11] Ninth
Circuit case law notes a distinction between a transmission from a unique source
copy as opposed to a transmission from a shared copy. *See, e.g., On Command
Video Corp. v. Columbia Pictures Industries*, 777 F. Supp. 787 (N.D. Cal. 1991)
("*On Command*") (viewing of video movies found public performance where
multiple users viewed from a single, common source copy).

The district court's logic leads to untenable results. For instance, using the
district court's reasoning, a homeowner who transmits the signal received by a

---

[11] The district court's observation that "very few people gather around their
oscilloscopes to admire sinusoidal waves of a television broadcast transmission" is
a straw man. (ER 6 (*Fox*); 18 (*NBC*).) No case law or legislative history
contemplates that an individual may sit in front of an oscilloscope and watch radio
waves; yet the Copyright Act and case law frequently refer to transmissions of
such waves, which, of course, result in a performance. The determination of
whether or not such a performance is public depends on the source and the
recipient.

rooftop antenna to multiple televisions throughout his or her home (whether by running separate wires from rooftop antenna directly to the other televisions, by running separate wires from one television to another, or through the use of a wireless device) would violate the Transmit Clause. That is not the law.

The harm does not stop with homeowners' rooftop antennas. Based on the ruling of the district court, a consumer who accesses a legally purchased and stored a Rolling Stones album on Apple's iCloud service would violate the Transmit Clause upon playing that album on various devices. *Cablevision* expressly addresses this point, noting:

> [t]he implication of this theory is that to determine whether a given transmission of a performance is 'to the public,' we would consider not only the potential audience of that transmission, but also the potential audience of any transmission of the underlying 'original' performance. . . . [T]his view obviates any possibility of a purely private performance.

536 F.3d at 136. This court should follow *Cablevision* and *Aereo's* interpretations of the Transmit Clause, and reject the district court's flawed reasoning.

4.  <u>Consumers use Aereokiller's technology to make only private transmissions, which do not violate the transmit clause</u>

Aereokiller provides technology that enables consumers to make private performances, not public ones. It enables nothing more than that which an individual could be accomplished with other legal home equipment such as an antenna or DVR.

By design, Aereokiller's technology is controlled by individual user choices and decisions to receive programming upon an individual user's request. Each transmission made by the consumer is private, from a single and unique copy particular only to that consumer. (ER 1065, 1071 (*Fox*); 1257, 1263 (*NBC*).) Aereokiller's technology works as follows: (1) its technology is initiated by the user and based on the use of mini-antennas; (ER 1065 (*Fox*); 1257 (*NBC*)); (2) each user has his or her own unique antenna and unique directory containing the data they selected to record; (ER 1065-66 (*Fox*); 1257-58 (*NBC*)); and (3) each user has the ability to control that data, including to stop, pause, close the application or switch channels (ER 1065-67 (*Fox*); 1257-59 (*NBC*)). The unique and dedicated nature of this technology directly parallels the technology at issue in *Aereo* and endorsed in the *Sony* and *Cablevision* decisions.

Accordingly, transmissions made by users of Aereokiller's technology do not constitute a public performance of any copyrighted work. Rather, that technology is used by consumers to make private performances consistent with what is allowed under the Transmit Clause.

5. <u>Aereokiller's technology enables consumers to engage in activities permitted under the "fair use" doctrine</u>

The right of individuals to use a technology to record over-the-air broadcasts as a matter of personal convenience is a long-standing and fundamental principle of modern copyright jurisprudence. This principle supports permitting Aereokiller

21

to operate as it did before the preliminary injunctions, *i.e.*, providing technology that enables its customers in the Ninth Circuit to receive, copy and watch at their convenience, their privately-made copies of over-the-air broadcast content.

In *Sony*, the Supreme Court held that Sony was not liable for secondary infringement for sales of the Sony Betamax, because consumer recording and play-back of television programs was "fair use" and did not violate the Copyright Act. *Id*. at 455-56. Moreover, the Supreme Court stated that such use served the public interest by increasing access to television programming, an interest that "is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves." *Id.* at 425 (citing *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 102 (1973)). "Fair use," as described in *Sony*, is, of course, not limited to the Betamax; rather, it applies to any technology enabling the user to record and playback information available on the public airwaves.

Aereokiller's technology performs exactly the same function as the Betamax in *Sony*: It allows the consumer to record and play-back broadcast programming through the convenient medium of the Internet. (*See* ER 1065, 1067 (*Fox*); 1257, 1259 (*NBC*).)

*Cablevision* and *Aereo* follow in *Sony*'s legal footsteps. As noted above, *Cablevision* involved remote storage DVR technology, which is further

22

advancement to the technology in *Sony*. *Aereo* involved mini-antenna technology with time-shifting abilities. Both technologies are primary features of Aereokiller's technology. And in both *Cablevision* and *Aereo*, it was held that if a technology merely enables one individual or household to view a discrete copy of a transmission, then that transmission is not public and does not infringe copyright. That holding is supported by *Sony*. *Compare Cablevision*, 536 F.3d at 134 ("if we assume that Cablevision makes the transmission when an RS-DVR playback occurs, we find that the RS-DVR playback, as described here, does not involve the transmission of a performance "to the public"); *and Aereo*, 874 F. Supp. 2d at 386 (finding "Aereo's system is materially identical to that in *Cablevision*"); *to Sony*, 464 U.S. at 449-50 (unauthorized home time-shifting of respondents' programs is legitimate fair use and time-shifting "merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use").

The court in another recent case in the Central District of California, *Fox Broadcasting Company, Inc., et al. v. Dish Network, L.C.C.*, 2012 WL 5938563 (C.D. Cal., November 7, 2012) (appeal pending) ("*Dish*"), followed *Sony* and *Cablevision*. *Dish* involves technology featuring programmable multichannel DVR with time-shifting (and commercial skipping) capabilities, as well as a "sling

adapter," allowing subscribers to view content on their computers and mobile devices via the Internet. *Id.* at *2-4. In that case, the plaintiffs brought a motion for preliminary injunction based on alleged violations of the Copyright Act. In its order denying that motion, the court relied on *Cablevision*, stating that "Fox has not established that Dish engages in any distribution because the…copies are made by users . . . and do not change hands." *Id.* at *15. The court also relied on *CoStar Group v. LoopNet, Inc.* in its determination that the plaintiffs had failed to meet their burden of a likelihood of success when it quoted "that the automatic copying, storage, and transmission of copyrighted materials, when instigated by others does not constitute direct infringement." *Id.* at *10 (quoting *CoStar Group v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004)).

As the Networks have argued here, the plaintiffs in *Dish* argued that copying and transmission of programming made by the defendants' technology violated the Copyright Act. The court found the transmission by Dish's technology is a private transmission. That court also found that the copy that Dish creates falls under the fair use exception, stating "[h]ere, the parties agree that the Hopper is only available to private consumers and the evidence does not suggest that consumers use the . . . copies for anything other than time-shifting in their homes or on mobile devices." *Dish*, 2012 WL 5948564 at *6. The court denied plaintiffs' motion for an injunction, concluding they could not show a likelihood of success in proving

the fair use exception did not apply to the defendants' private transmissions and copying.  Aereokiller's technology involves private transmissions, not public ones, and thus falls under the fair use exception.  Accordingly, the district court should have reached a result similar to the result in *Dish*.

### B.    Precedent In This Circuit Is Consistent With *Cablevision*

The district court found *Cablevision's* focus on the "uniqueness of the copy from which the transmission is made" at odds with Ninth Circuit precedent.  (ER 6 (*Fox*); 18 (*NBC*).)  But, in support of that assertion, the district court only cited one case – *On Command*.  Acknowledging that *Cablevision* explicitly distinguished *On Command* on its facts, the district court asserted that the factual distinction of *On Command* was irrelevant because "[p]recedent in the Ninth Circuit … properly looks at public performance of the copyrighted work."  *Id*.  But *On Command* is factually distinguishable from this case.  There, the technology at issue involved transmissions from non-unique copies – copies shared by multiple users.  *On Command*, 777 F. Supp. at 788.  There is no tension between *Cablevision's* emphasis on the uniqueness of the copy and *On Command* or other Ninth Circuit precedent.

In both the Second and Ninth Circuits, the uniqueness of the copy determines whether a performance is transmitted public or privately.  *On Command* and *Warner Bros Ent. Inc. v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003

25

(C.D. Cal. 2011) ("*WTV*"), are perfectly consistent with *Cablevision's* correct

interpretation of the Transmit Clause, because the technology at issue in *On*

*Command* and *WTV* involve transmission from a common (rather than a unique)

source. *See*, *e.g.*, *Cablevision*, 536 F.3d at 138-39 (use of a unique copy as the

source of transmission limits the potential audience). In fact, the court in *WTV*

explicitly acknowledged *Cablevision's* interpretation of the Transmit Clause and

distinguished its ruling from *Cablevision* on this basis. *WTV*, 824 F. Supp. 2d at

1011. *On Command* and *WTV* dealt with technology relevantly different from

Aereokiller's technology – technology that did not transmit unique copies to users

in ways consistent with users' long-standing fair use rights.

 *On Command* involved a hotel video-movie system consisting of a bank of

VCRs centrally located in a hotel equipment room. *On Command*, 777 F. Supp. at

788. The VCRs were connected to hotel guest rooms by wiring. *Id*. Each VCR

contained a videotape of a movie. *Id*. Hotel guests could select a particular movie

in their room by means of a remote control. *Id*. After a guest selected a movie by

entering a specific code, a computer program directed that a particular VCR would

be dedicated to transmitting the movie to the room of the guest -- other guests

could not simultaneously access that copy. *Id*. However, once the viewing guest

finished watching the movie, other guests could order the same movie. *Id.* In that

instance, the same VCR played the same videotape copy to an additional recipient.

*Id.*  The hotel guest could not pause, rewind or fast-forward the copy.  *Id.*  The

*Cablevision* court specifically distinguished *On Command* because, in that case, a

single source was played to multiple members of the public at different times,

noting that:

> [S]uccessive transmissions to different viewers in [*On Command*] could be made using a single copy of a given work.  Thus, at the moment of transmission, any of the hotel's guests was capable of receiving a transmission made using a single copy of a given movie.

*Cablevision*, 536 F.3d at 139.[12]  For the same reasons, *On Command* is also readily

distinguished from this case.

    *WTV* also involved multiple users watching copyright content from the same

source, albeit at different times.  In *WTV*, defendants operated a "DVD rental"

service called Zediva, available through a website.  *WTV*, 824 F. Supp. 2d at 1006.

The defendants purchased hundreds of DVD players and installed them in cabinets

---

[12] While relying on *On Command,* the district court essentially ignored a related contemporaneous case, *Columbia Pictures Industries v. Professional Real Estate Investors*, 866 F.2d 278 (9th Cir. 1989).  There, the defendant was a hotel (as in *On Command*) that rented out videos to its customers but provided VCRs as well as other equipment (*e.g.*, larger screens) *in each guest's room*.  Despite the fact that the videos themselves were viewed on multiple occasions, the court found that the hotel was not a "retransmitter" because the hotel was merely providing the consumers equipment that allowed them to watch the videos in private.  The court concluded that defendant hotel "does not violate section 106(4) by providing in-room videodisc players and renting videodiscs to its guests. In drawing this conclusion, *we are aware that technology has often leapfrogged statutory schemes.* Nevertheless, it is Congress, not for the courts, to update the Copyright Act if it wishes to protect viewing of videodisc movies in guest rooms at [defendant's hotel]."  *Id.* at 282 (emphasis added).  Similarly, here, Aereokiller merely provides the equipment and then allows the user to watch programming of the user's choice.

at a data center in California.  *Id*.  The defendants also purchased hundreds of

DVDs of copyrighted movies and placed the DVDs in the DVD players.  *Id.* at

1007.  The defendant's technology converted the analog signal from the DVD

players to a digital signal and then streamed the DVD content to users.  *Id*.

However, the defendant's customers did not have access or control over a specific

DVD or DVD player but rather streamed the content of the DVD for a specific four

hour time period.  *Id*.  After four hours of total "rental time," the DVD player

stopped the transmission and began a new transmission from the *same* DVD and

DVD player to a different customer.  *Id*.  The defendants in *WTV* argued that the

transmissions to customers were not "to the public" under *Cablevision*.  There, the

court rejected that argument, because defendant's technology did not transmit from

unique copies and therefore was infringing under the *Cablevision* analysis.  In

*WTV*, there was no concern with *Cablevision's* application in the Ninth Circuit;

rather, the court stated:

> In this case, unlike *Cablevision*, Defendants' customers
> do not produce their own unique copy of Plaintiffs'
> Copyrighted Works.  Instead, like *OnCommand* and *Redd
> Horne*, the same DVD is used over and over again to
> transmit performances of Plaintiff's Copyrighted Works
> … Thus, despite Defendants' argument to the contrary,
> the Second Circuit in *Cablevision* explicitly found that
> *Redd Horne* 'supports our decision to accord significance
> to the existence and use of distinct copies in our transmit
> clause analysis.'

*Id.* at 1011, fn. 7. *WTV* extensively quoted *Cablevision* for the proposition that "the use of a unique copy may limit the potential audience of a transmission and is therefore relevant to whether that transmission is made 'to the public.'" *Id.*[13] Thus, contrary to the district court's claim, the Ninth Circuit has expressly adopted and approved of *Cablevision's* transmit analysis and in a manner that reconciles the holding in *On Command*.

Here, as in *Cablevision* and importantly unlike in *On Command* and *WTV*, there is no common copy used by Aereokiller's technology – rather, each user views only that user's unique copy. Accordingly, there is no infringement.

## III.  The Networks Failed To Demonstrate Irreparable Harm

The district court erred in concluding that the Networks demonstrated irreparable harm. The district court found that the Networks demonstrated four categories of irreparable harm: (1) Lost revenues from retransmission consent licensing with cable, satellite and telecommunications providers; (2) competition with the Networks' ability to develop their own Internet distribution channels; (3) goodwill damage caused by the availability of the Networks' content from sources other than Networks; and (4) harm in the Networks' position in negotiations with

---

[13] Both *Cablevision* and *WTV* cite Professor Nimmer's treatise as the source of the idea that whether a copy is unique is relevant to whether that transmission is made "to the public."

advertisers by diverting users from measurable audiences.  (ER 7-8 (*Fox*); 19-21 (*NBC*).)  Each of these purported harms, however, assumes that Aereokiller's technology and service infringed the Networks' copyright.  Because Aereokiller's technology and service lawfully enable private performances and fair use, the Networks have not been deprived of any property right or other interest.

Congress balanced the interest of copyright owners and the public in accessing and receiving transmission of copyrighted works when it drafted the Transmit Clause.  Congress' decision to allow purely private performances entailed certain practical consequences for the Networks.  The evolution and use by consumers of a technology like Aereokiller's is one such consequence.  Even if Congress had not so decided, the Networks' harms are wholly speculative and monetary in nature and therefore not irreparable under the law.

### A.    There is No Harm Because There Was No Infringement

Here, none of the irreparable harms cited in the district court's opinion are, in fact, harms.  Aereokiller's technology does not infringe Networks' copyrights because Congress chose to prohibit only public performances and allow private performances in drafting the Transmit Clause.  *See*, *e.g.*, *Cablevision*, 536 F.3d at 136 ("the Transmit Clause obviously contemplates the existence of non-public transmissions").  Because private performances like those enabled by Aereokiller's technology are lawful, the purported irreparable harms cited by the Networks and

30

the district court are in reality just the practical consequences of Congress'
considered policy choices. Congress here chose not to grant the Networks an
exclusive copyright interest in transmission received by a unique antenna and
transmitted in a manner consistent with a user's fundamental fair use rights. The
Networks have no enforceable right to control all transmissions of their works,
whether over wires inside an individual's home or over the Internet; nor may the
Networks necessarily avoid the alleged "pressure on licensing relationships"
between the Networks and other Internet distribution channels such as Hulu or
Apple created by private transmissions, like those made by Aereokiller's
consumers. All of the Networks' "irreparable harms" relate to copyright interests
that the Networks do not, in fact, possess. The Networks cannot be "harmed"
through deprivation of a right they do not hold in the first instance.

### B.    The Networks' Harms Are Speculative

The Networks had the burden of demonstrating harm through actual injury.
*Winter*, 555 U.S. at 20. They failed to carry that burden. The Networks presented
only speculative losses, which are insufficient to establish actual harm for purposes
of irreparable harm analysis. *See, e.g., Colorado River Indian Tribes v. Town of
Parker*, 776 F.2d 846, 849-50 (9th Cir. 1985) (theoretical harm of reduced
commerce, trade and unfavorable publicity not enough for a conclusion of
irreparable harm in the absence of evidence of actual loss); *Softman Prods. Co.,*

31

*LLC v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075, 1090 (C.D. Cal. 2001) ("There must be evidence of actual injury to support claims of irreparable injury").  The Networks and the district court relied almost exclusively on the self-serving and speculative declaration of Fox Cable Networks executive Sherry Brennan (the "Brennan Declaration") to demonstrate irreparable harm.  (*See, e.g.*, ER 6-7 (*Fox*); 19-20 (*NBC*).)  For example, paragraph 17 of the Brennan Declaration describes the "inevitable" but vague monetary harm which will supposedly ultimately result after the long-term process of Aereokiller subscribers cancelling their subscriptions with cable providers, at some point causing the providers to have less revenue, which then leads to cable providers paying less for retransmission rights.  (ER 1461 (*Fox*); 1749 (*NBC*).)  That prolonged and hypothetical chain of consequences does not constitute immediate, irreparable injury.  In paragraph 15 of her declaration, Ms. Brennan admits she is engaged in pure speculation: "While *it is impossible to know* how much revenue the Broadcast Companies will lose when they negotiate retransmission agreements … I am certain … [Aereokiller's technology] will be a factor in such negotiations."  (ER 1460-61 (*Fox*); 1748-49 (*NBC*) (emphasis added).)  The district court and the Networks nowhere explain the logical leap from Aereokiller's technology being a potential "factor" in hypothetical future negotiations to immediate irreparable injury.

The Networks' declaration regarding irreparable harm is also internally inconsistent. The Networks claim that, because the Nielsen ratings are the only metrics advertisers rely on and because those ratings only measure viewing activity at traditional televisions, Aereokiller's technology might ultimately deprive the Networks of revenue by shrinking the Nielson audience. (ER 1457-60 (*Fox*); 1745-48 (*NBC*).) But, in paragraphs 15-17, the Networks also provide statements related to the Networks' efforts to license Internet transmission and. (ER 1460-61 (*Fox*); 1748-49 (*NBC*).)

Such speculative and inconsistent testimony does not establish the immediate and irreparable harm necessary for a preliminary injunction to issue.

## IV.    The Balance of Hardships Favors Aereokiller

The district court declined to balance the relative hardships of the parties. Instead, it held that since Aereokiller's conduct constituted an infringing activity, it had no right to complain of the hardship suffered because of the injunction. (*See* ER 8 (*Fox*); 20 (*NBC*).) But Aereokiller's technology does not infringe the Networks' copyrights. Accordingly, the district court's failure to weigh Aereokiller's hardships against the Networks' was in error. *See, e.g., Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) (court must balance hardships against both enterprises in granting preliminary injunction).

33

A comparison of the hardships shows that the balance favors Aereokiller. Aereokiller has far fewer resources than the Networks. Further, Aereokiller has devoted a significant amount of those resources to the development of its remote mini-antenna/DVR technology. Having made such commitments, Aereokiller may not recover from the harm caused by a disruption to its business. On that basis, the balance of hardships tips towards Aereokiller. *See, e.g., Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491-92 (2d Cir. 2002) (affirming denial of preliminary injunction due to serious concerns that Rosetta would go out of business balanced against Random House's alleged loss of goodwill).

The balance of hardships here resembles the balance of hardships in *Aereo*. There, the district court found that as a small business, Aereo would suffer substantial harm if the injunction was entered, including the loss of the labor and capital used to develop and launch its system. *Aereo*, 874 F.Supp. 2d at 402. The court also held that the proposed injunction would "diminish or destroy a variety of [Aereo's] intangible resources," by employee loss and the inability to raise additional capital, among other things. *Id.* Further, the court found the injunction would harm its competitive advantage in developing an innovative product, undermine its substantial investment in launching new products and cause a loss of customers and goodwill. *Id.* at 403. All of the same factors considered in Aereo, apply here. Having deprived Aereokiller of the ability to offer its technology to

34

consumers in the Ninth Circuit, the injunctions have already proved a substantial hardship to Aereokiller and threaten the survival of its nascent and innovative business.

The Networks have not put forth any non-speculative, non-hypothetical evidence concerning their purported injury.  When weighed against the threat to Aereokiller's business posed by an injunction, the balance of hardships tips decidedly in favor of Aereokiller.

## V.    The District Court's Rulings Harm The Public Interest

The district court erred in determining that the public interest favors the injunctions.  (*See* ER 8 (*Fox*); 20 (*NBC*).)  The district court acknowledged there is a public interest in making television broadcasting more widely available, citing *Sony*.  (*Id.*)  However, it found that a determination of the public interest was "inextricably bound up" in its decision of the merits of this case and that the public interest in upholding copyright protections favored the Networks.  (*Id.*)  But here, there is no valid protection to uphold.  The Transmit Clause's prohibition on transmitting copyrighted works does not apply to technologies that enable private performances, such as Aereokiller.

The injunctions harm the public interest.  The injunctions in this case undercut the public policy Congress has specifically advocated– the protection of the public's right to engage in private performance.  The district court's rulings

35

prevent individuals from viewing private transmissions of publicly available broadcast programming in an important new and convenient way.

The injunctions also undermine the public interest in technological innovation. The underlying aim of copyright law is to balance the protection of artistic expression with technological innovation. *See, e.g., Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.,* 545 U.S. 913, 928 (2005) (The more artistic protection favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise in managing the tradeoff.). Here, the district court's injunctions deprive individuals of a right to utilize technology to access content to which they already have rights. To protect against such outcomes, federal courts generally favor the technology innovator over the copyright holder when considering public interest. *See, e.g., Softman,* 171 F. Supp. 2d at 1091 ("A system of 'licensing' which grants software publishers this degree of unchecked power to control the market deserves to be the object of careful scrutiny.").

The injunctions undercut innovators and investors in Aereokiller and its competitor Aereo who relied on *Cablevision's* guidance regarding what constitutes a private performance in designing and launching technologies and services to the public. The potential obstacles to innovation posed by the injunctions and the district court's construction of the Transmit Clause extend well beyond Aereokiller's technology and service. For example, numerous technology

companies like Google and Apple offer cloud storage services that allow consumers to store their music and other content remotely in the cloud, where it may be accessed when, where, and how the consumer chooses.  Under the district court's construction, these new technologies potentially enable improper public transmissions of copyrighted work.

Commentators and media advocacy groups have shown a strong interest in protecting broad and convenient consumer access to media, as reflected in amicus briefing submitted by the Electronic Frontier Foundation and Public Knowledge in support of the *Aereo* defendant's opposition to a preliminary injunction motion in that case.  (*See* ER 962-1006 (*Fox*); 1154-98 (*NBC*).)[14]  Also in *Aereo*, because the principles articulated in the Transmit Clause, as explained in Cablevision are so critical to consumers' rights and innovation, NetCoalition and Computer & Communications Industry Association filed an amicus brief "in support of neither

---

[14] The district court wrongly denied FilmOn's request to take judicial notice of two amicus briefs filed in *Aereo* that are cited in this section of the brief, although it did correctly take the requested judicial notice of a scheduling order.  (*See* ER 4 (Fox); 16 (*NBC*).)  The scheduling order and amicus briefs were attached as exhibits to a request to take judicial notice.  (ER 956-58 (Fox); 1148-50 (*NBC*).)  Federal Rule of Evidence 201 provides for judicial notice of facts that are not subject to reasonable dispute and is appropriate when the fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  It is well-established that a federal court may take judicial notice of pleadings and records from other lawsuits.  *See Ellingson v. Burlington Northern, Inc.*, 653 F.2d 1327, 1330-31 (9th Cir. 1981); *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *cf. Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004) (a district court "may take judicial notice of the records of state agencies and other undisputed matters of public record.") (citation omitted).

party" but setting forth arguments in support of *Cablevision* and its progeny.  (*See* ER 991-1006 (*Fox*); 1183-98 (*NBC*).)[15]  Many of those same organizations intend to support this brief.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should reverse the district court's rulings.

DATED:  March 15, 2013                         BAKER MARQUART LLP

                                               By: /s/ Ryan G. Baker
                                                    Ryan G. Baker

                                               *Attorneys for Defendants-Appellants*
                                               *Aereokiller LLC; Alkiviades David;*
                                               *FilmOn.TV Networks, Inc.;*
                                               *FilmOn.TV, Inc.; and FilmOn.com,*
                                               *Inc.*

---

[15]  This amicus brief is Exhibit C to Aereokiller's request for judicial notice, which was wrongly denied by the district court.

## STATEMENT OF RELATED CASES

Counsel for Defendants-Appellants is not aware of any related cases. As noted in this opening brief, this is a consolidated appeal of two district court preliminary injunctions, with two cross-appeals seeking to determine the scope of those injunctions. Those Ninth Circuit case numbers are 13-55156, 13-55157, 13-55226 and 13-55228.

**Form 6.     Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☒ this brief contains 9858_____words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains_____lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* Microsoft Word 2010_____
*(state font size and name of type style)* 14, Times New Roman_____, *or*

☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)*_____
with *(state number of characters per inch and name of type style)*_____

_____.

Signature  /s/ Ryan G. Baker

Attorney for  Defendants-Appellants

Date  March 15, 2013

9th Circuit Case Number(s) | 13-55156, 13-55157, 13-55226 and 13-55228

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
## When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | March 15, 2013 |.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Ryan G. Baker

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
## When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | |.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |